# APPENDIX A

**Online Reputation & Damages Assessment**

**Expert Witness Report**

**Regarding:**

Brian Menge,

*Plaintiff*

v.

City of Highland Park, a municipal corporation,

*Defendant*

**Prepared By:**

Sameer Somal, CFA

CEO, Blue Ocean Global Technology,

July 24, 2024

**Section 1: Expert Witness Engagement & Basic Findings**................................................**4**

    Engagement Summary.................................................................................5

    Basic Findings and Conclusions.................................................................6

    Documents Reviewed - Appendix B............................................................6

**Section 2: Expert Witness Qualifications**............................................................**7**

    Sameer Somal Biography...........................................................................8

    Articles Authored By and Featuring Sameer - Appendix A............................9

    Recent Speaking Engagements and References - Appendix A.......................9

    Continuing Legal Education (CLE) Programs - Appendix A.............................9

    Expert Witness Case History - Appendix A..................................................9

    About Blue Ocean Global Technology........................................................10

    Statement of Compensation.....................................................................11

**Section 3: Defamation & its Impact on the Reputation**.....................................**12**

    False Allegations amounting to Defamation..............................................13

    Amplified Impact of Defamation from Public Office....................................16

    Defamation Vs. Freedom Of Expression....................................................18

    Harm to reputation from digital media.....................................................20

    Malice involved in case of Negative and Defamatory Statement..................22

    Amplified Impact of Defamatory Content on Social Media...........................24

**Section 4: Freedom of Information Act (FOIA) Request**.....................................**27**

    Overview of FOIA Request........................................................................28

    Response from the City of Highland Park...................................................29

    Analysis of Documentation and Lack Thereof.............................................30

**Section 5: Elements of Rehabilitation Program**................................................**31**

    An Investigator's Reputation Being Instrumental to their Credibility............32

    Rebuilding a Damaged Reputation............................................................34

    Regaining Credibility in Court...................................................................37

    Relationship Between Lawyer and Plaintiff................................................40

    Existing Reputation of Brian Menge to Build upon......................................41

**Section 6: Legal Cases**.................................................................................**43**

    Defamation Per Se..................................................................................44

    Defamation through Social Media.............................................................52

    Intent of Malice......................................................................................57

**Section 7: Assessment of Damages**...............................................................**61**

    Rationale for Recommendation of Damages based on Reputational Harm.....62

    Summary Findings..................................................................................64

Damages..........................................................................................................67
    Economic Damages.....................................................................................67
    Rehabilitative Damages...............................................................................69
    Reputational Damages.................................................................................70
    Emotional Distress Damages........................................................................72



**Section 1: Expert Witness Engagement & Basic Findings**

----------------------------------------------------------------------------------------------------

Engagement Summary

Basic Findings and Conclusions

## Engagement Summary

Mr. Robin Kyle, the attorney in this matter, retained me as an expert through The TASA Group to ascertain the damages incurred to Mr. Brian Menge from the false and erroneous allegations made by the Defendants, and the associated proliferation of negative sentiment across social media and the internet.

A large portion of my professional time as CEO of Blue Ocean Global Technology is spent on actual digital reputation client situations. As such, I feel confident in my ability to approach this case from the lens of both an expert witness and a professional with a track record of successfully mitigating reputational damages originating from false or defamatory statements published on the internet. As a digital reputation and online reputation management expert, I apply my cumulative knowledge and experience to assess an individual's damages and recommend the appropriate course of action to remediate damages moving forward.

## Basic Findings and Conclusions

---

After a thorough analysis of the frivolous claims made against Mr. Brian Menge through the malicious Facebook video, my basic findings and conclusions are:

Mr. Brian Menge has incurred significant damages resulting from the defamatory, cancel culture style accusations made by the Defendants, consisting of: (a) Economic, (b) Rehabilitative, (c) Reputational and (d) Emotional Distress, a breakdown of all damages total:

Economic Damages: in the form of lost projects in the capacity of an independent investigator, opportunities to grow his practice up to this time and the loss he would continue to suffer (in the next three years conservatively) to be in excess of atleast $283,500.

Rehabilitation Damages: $15,000/month for a period of 12 months - 18 months (calculated taking the lower range) = $180,000.

Reputational Damages: in the range of $550,000 - $750,000.

Emotional Distress Damages: in the range of $250,000 - $300,000.

## Documents Reviewed - Appendix B

## Section 2: Expert Witness Qualifications
-----------------------------------------------------------------------------------------------------------

SAMEER SOMAL BIOGRAPHY

ARTICLES AUTHORED BY AND FEATURING SAMEER - APPENDIX A

RECENT SPEAKING ENGAGEMENTS AND REFERENCES - APPENDIX A

CONTINUING LEGAL EDUCATION (CLE) PROGRAMS - APPENDIX A

ABOUT BLUE OCEAN GLOBAL TECHNOLOGY

EXPERT WITNESS CASE HISTORY - APPENDIX A

STATEMENT OF COMPENSATION

## Sameer Somal Biography

Sameer Somal is the CEO and co-founder of Blue Ocean Global Technology.

Mr. Somal writes and frequently speaks at conferences about digital transformation, online reputation management, internet defamation, search engine optimization, social media, and professional ethics.

Fundamental to his work at Blue Ocean Global Technology, Mr. Somal leads a team of multi-industry professionals focused on public relations, law, digital marketing, and technology development. Through Blue Ocean Global Technology, Mr. Somal helps clients build, monitor, and repair their digital presence/reputation.

In collaboration with the Philadelphia Bar Foundation, Mr. Somal has co-authored Continuing Legal Education (CLE) programs on defamation and related topics. He is also a former member of the Legal Marketing Association (LMA) and the Education Advisory Council (EAC).

Mr. Somal also proudly serves on the national board of Future Business Leaders of America and is a Co-Founder of Girl Power Talk. He is a member of the International Business Fellows (SIBF) and a CFA Institute 2022 Inspirational Leader Award recipient.

**Articles Authored By and Featuring Sameer - Appendix A**

**Recent Speaking Engagements and References - Appendix A**

**Continuing Legal Education (CLE) Programs - Appendix A**

**Expert Witness Case History - Appendix A**

## About Blue Ocean Global Technology

---

Blue Ocean Global Technology is a team of global professionals committed to learning, excellence, and helping our clients — both individuals and entities — achieve optimal results when it comes to repairing, building, and protecting their online reputation.

Blue Ocean Global Technology creates and promotes top digital assets that accelerate growth and brand equity. We effectuate comprehensive reputation management services, which often include Search Engine Optimization (SEO), Social Media Marketing (SMM), and web development. When an individual or organization faces a reputation crisis, or legal or public relations issues that involve the internet, we specialize in mitigating the impact of the defamatory content and repairing the negative reputational damages.

## Statement of Compensation

Sameer is normally compensated at $605/hour, which covers research, investigation, testing, analysis, writing, reading, interviewing, responding, and time required to author his expert witness report. All payments are made to Blue Ocean Global Technology, LLC.

**Section 3: Defamation & its Impact on the Reputation**

-----------------------------------------------------------------------------------------------------------------

FALSE ALLEGATIONS AMOUNTING TO DEFAMATION

AMPLIFIED IMPACT OF DEFAMATION FROM PUBLIC OFFICE

DEFAMATION VS. FREEDOM OF EXPRESSION / THIN LINE BETWEEN OPINION AND FACT

HARM TO REPUTATION FROM DIGITAL MEDIA

MALICE INVOLVED IN CASE OF NEGATIVE AND DEFAMATORY STATEMENT

AMPLIFIED IMPACT OF DEFAMATORY CONTENT ON SOCIAL MEDIA

## False Allegations amounting to Defamation

False Allegations are an integral aspect of defamation. Along with communication to a third party and the communication resulting in harm to the reputation of the individual or entity in question, a false allegation is the third ingredient.

False allegations can lead to a range of adverse consequences. Primarily, one's reputation becomes a glaring target, leading to personal and professional repercussions such as loss of business and strained relationships. Moreover, the aftermath may involve a protracted and expensive legal ordeal to vindicate the individual's name.

In the case of Friedrichsen v. Rodriguez, No. 14-19-00850-CV (Tex. App. Oct. 26, 2021), the Court of Appeals upheld the trial court's judgment and noted that the false allegations were made to terminate Friedrichsen's employment and negatively impacting his business reputation. While agreeing with the same, the court further noted:

> *"Prior to the date of this lawsuit, [Friedrichsen] attempted to explain that this allegation which concluded in [Friedrichsen] being wrongfully accused of "violation of Code of Conduct 2.2" of BBVA Compass Code of Conduct was false because it was based on incorrect information which led to unfair, unsubstantiated, and unjust investigative conclusion. [Appellees] were made known of the fact that the accusation is/was false. [Appellees] continued to insist on the falsity of the information which led to a false conclusion."*

Similar to the case at hand, false allegations such as stealing cars from the police impound and stealing funds from the government have damaged Brian Menge's ability to conduct business. The false allegations of being a thief and a dishonest officer have painted a negative picture of Mr. Menge's ethics, a key ingredient of defamation. Furthemore, he has also been accused of stealing cars from the police impound, making it harder for Mr. Menge to secure a case for his business. It was noted by former Chief of Police, Kevin Coney that Mr. Menge wasn't even related to the department handling auto theft so Councilman Ash-Shafii *"is not telling the truth."*

It must also be noted that while freedom of expression is a right, freedom from reputation unimpaired by false and defamatory attacks is also a right. It was held similarly in the case Schlegel v. Ottumwa Courier, 585 N.W.2d 217 (Iowa 1998). The court noted:

> "[t]he law of defamation embodies the public policy that individuals should be free to enjoy their reputation unimpaired by false and defamatory attacks. An action for defamation or slander is based upon a violation of this right."

Violation of such a right can have a severe impact on the victim, such as in the case of Muderis v. Hernandez 2:19-cv-01002-APG-DJA (D. Nev. Jan. 5, 2022). The plaintiff suffered a loss to business due to the defendant publishing false statements about the plaintiff's business. The false allegations not only resulted in the plaintiff losing new patients he should've gained, but also lost many to his competitors. He sued the defendant for false advertising and unfair competition allegations, and their defamation claim. The court found in favor of the plaintiff on both claims. For the Lanham Act claim, the court awarded $2,510,000 in total damages, comprising $2,400,000 in actual damages for lost business and $110,000 as disgorgement of the defendant's profits. Regarding the defamation claim, the court acknowledged the defamatory nature of certain statements and found that punitive damages of $100,000 were appropriate due to the defendants' malicious intent and continued publication of false allegations even after receiving cease-and-desist letters.

Furthermore, in the case of Badame v. Lampke, 242 N.C. 755, 757, 89 S.E.2d 466, 468 (1955), The plaintiff and defendants were competitors in the sewing machine industry in Charlotte. The Defendant allegedly had a phone conversation with the plaintiff's client and was accused of making false allegations, suggesting that the plaintiffs were involved in shady deals and wouldn't deliver good machines. These allegations were not only false but also maliciously intended to harm their business reputation. They argue that as a result, their business suffered, leading to a loss of customers and prospective customers, amounting to $25,000 in damages. The court ruled in favor of the plaintiff, stating that Lampke's words imputed a disreputable business character to the plaintiff, constituting defamation per se.

It was also stated by Michael Ochs, a police officer who worked first hand with Mr. Menge for a considerable amount of time, that Mr. Menge never even had access to the forfeiture fund. He also stated that the plaintiff has *"always been honest and trustworthy."*

The above examples display how the courts observe an individual misusing their First Amendment rights for nefarious purposes. False allegations pose a significant threat to individuals and their profession. Given the significant risk posed by false allegations established above, be they of financial, reputational, or ethical nature, it becomes evident how crippling such actions can be for the victim.

## Amplified Impact of Defamation from Public Office

False accusations of criminal conduct can be devastating to a person's life, personally and professionally. Such claims translate directly into loss of income and opportunity and a tarnished professional reputation that often cannot be repaired.

The damage is amplified when the defamation comes from a public official. Generally, the public may be skeptical of such claims from one private individual against another. The accusation will be damaging, but some level of uncertainty remains. The claim is unproven, untried, and unofficial. In such cases, the person defamed stands a better chance of refuting the false claims publicly, controlling the repairing the damage.

But when public officials make accusations of criminal conduct, their statements carry far more weight. These officials are seen as speaking for the government entities they serve, be it the state or the city—more so if the statements are made in an official capacity such as a city council meeting.

Society places a high degree of trust in public officials. Once a public official brands a person with criminal allegations, the community's impression of the person will be negative. For private investigators, attorneys, financial advisers—anyone whose profession relies on public trust, false allegations made by public officials can do irreparable damage. On a professional level, the damage affects current and potential clients as well as employees, colleagues, outside partners, and the entire network of contacts one needs to conduct business.

In certain professions, such accusations can be career-ending. This is certainly the case with private investigators, a profession that is reliant on trust. These individuals work closely with attorneys in cases that often wind up in court, making trust an essential element on every level, from the client up. The lawyers involved on their own would be reluctant to hire an investigator with a tarnished reputation; their clients would likely refuse.

Damage from defamation seeps quickly into the victim's personal life, as well. Defamation can wreak havoc on relationships with family, friends, and neighbors. Victims often feel they must

constantly explain the circumstances and refute charges to everyone they come across, leading to mental anguish and mental health issues.

Normally, public officials enjoy privilege, or liability from comments they make in their jobs. The logic is that members of the executive, legislative, and judicial branches of government must be able to speak freely to do their jobs effectively. It is in the public interest.

At the same time, it must be recognized that statements made by public officials carry far more weight. Public opinion often becomes fixed long before a case can be brought to court, and the victim is left with no way to repair the damage.

Similarly, in the current case, the false statements by the councilman have caused incredible harm to Mr. Menge's reputation. Since Mr. Menge was accused of criminal activities, directly questioning his integrity and credibility, an essential characteristic for a profession like his. Due to the position that Mr. Shafii holds, these false accusations become far more difficult to refute.

# Defamation Vs. Freedom Of Expression

Freedom of speech and expression, as recognized by the principles of human rights, has always conflicted with the legislation and principles set down to prevent defamation and protect the privacy of individuals. The expansion of the internet and the establishment of an online world have empowered individuals to share their thoughts, opinions, and ideas with large online audiences, seemingly unchecked. As explained, any post or comment made online can reach an expansive audience in a viral matter overnight. This is the power of the internet.

The individual expression published online is protected under the principles of human rights and freedom of speech and expression, but such freedoms must be tempered with the fundamental rights to be free from invasion of privacy and the damages associated with defamation. There has been a continuous debate and battle between these conflicting forces. The ongoing conflict between defamation laws and the human right to freedom of speech continues due to the fact that, on one hand, the principle of human rights supports the idea that freedom of opinion and expression are indispensable conditions for the full development of the person (O'Flaherty, 2015[1]). On the other hand, defamation laws restrict the publication of statements that might harm the reputation of the individual.

Even though most of the international human rights instruments recognize the restrictions that must be imposed on speech in the interest of protecting the reputation and privacy of the individual, at times local defamation laws that are not crafted carefully may pose a threat to free expression. Due to the alarming effect of the internet, where a statement posted online can domino in a matter of minutes, it is also necessary under the established laws of our democracy to impose certain restrictions to protect people's privacy and reputation. Consequently, the legislature has imposed the will of the public by enacting laws that value and protect the reputation of individuals who have been damaged by defamatory publications. While freedom of speech enjoys legal protections, such protections are not afforded to those who bear false witness and publish false statements to third parties.

---

[1] O'Flaherty, Michael. Freedom of Expression: Article 19 of the International Covenant on Civil and Political Rights and the Human Rights Committee's General Comment No. 34, 12 Hum. Rights L. Rev. 627 (2012)

**Why Is Free Speech Not An Absolute Immunity Or Qualified Privilege Against Defamation**

The right to free speech does not guarantee protection from defamation lawsuits, even when directed at public officials. People also have a right to protect their reputations against unwarranted attacks. The conflict between these two opposing rights is a complicated one that has been hammered out in courts over time. Of key importance, free speech does not offer complete protection from misstatements of fact.

The First Amendment guarantees *"the freedom of speech, or of the press; or the right of the people to peaceably assemble, and to petition the Government …"* The purpose is clear: the public should be able to criticize public officials to combat corruption and to make the government more responsive to the electorate.

At the same time, common law traditionally protected against defamation, or the harming of someone's reputation through false statements. In courts, defamation is divided between slander, or false oral statements that harm someone's reputation, and libel, or written statements that damage a person's reputation.

Therefore, upon examination of the present case, it becomes evident that defamatory remarks made during the council meeting have significantly harmed Mr. Menge's professional standing and prospects for the future. Consequently, these remarks cannot be defended under the protection of freedom of speech.

# Harm to reputation from digital media

The traditional avenues of communication used to be physical print media, television, and radio, and each was limited in its respective ways. Conversely, with society's mass adoption of social media and the internet, the use of traditional media has become fragmented.

The ways in which traditional avenues of communication mitigated the threat of damage to a people's reputations included, but were not limited to, the following:

1. Affordability

   When print, television, and radio were the common means of communication, it would have been an expensive undertaking to publish defamatory content to thousands of people, let alone the tens of millions of individuals who have access to the internet.

   Conversely, anyone wanting to publish content, whether defamatory or otherwise, can reach millions of people at no cost.

   Moreover, the devices on which the internet can be accessed are generally affordable, carried with us wherever we go in the form of mobile phones, and are even available to access for free at public institutions. Accessing the internet has become very affordable for almost everyone, resulting in a huge number of users who might either be the source of negative or defamatory content or form part of the greater audience negative content can reach in a matter of seconds.

2. Convenience

   The use of social media, and more specifically the use of various web applications, has made it very convenient for individuals to share their thoughts and opinions about any topic, person, or entity. Anyone having access to the internet can therefore conveniently share their thoughts, materials, and videos by using websites, blogs, vlogs, and comment sections. Hence, people can participate in any discussion without expertise or training in the field. Social media platforms and applications also facilitate the download of any material posted online quickly and easily. This convenience has opened an opportunity for sharing unrestricted and non-scrutinized content online, which can be viewed by

anyone worldwide. It has therefore become more susceptible to posts that threaten individuals' rights of privacy and reputation.

3. Widespread Outreach

As discussed earlier, social media platforms reach anyone without the traditional restrictions associated with geographical location. This content can be accessed by users located anywhere around the world, thus exponentially expanding the potential for damages realized by victims. Moreover, the global nature of social media platforms connects a world audience to a variety of content, which can make a precise quantification of damage incurred by victims as a result of negative content difficult.

The internet is a popular source for research since information such as court documents and judgments have been digitized, making it accessible to a broader audience when compared with offline sources. A person only requires a smartphone and an internet connection to access all the information on the web, compared with libraries and courthouses that require one to be physically present. All this has made the propagation of information faster than ever before. However, this ease of access also means that negative information is as readily available as positive content, if not more so.



*Screenshot of council meeting involving false allegations against Brian Menge*

Mr. Menge's long time colleague and friend, Officer Mitch Heaney commented on the damage to reputation, particularly from social media. He noted *"... even though, those [statements] are false and they're proven to be false, yeah, it's out there. The damage is done. You've made those statements on social media and, cops talk and the word spreads around."*

People are naturally attracted to negative information and they weigh <u>negative information</u> more heavily than positive information when learning about others and making decisions.

## Malice involved in case of Negative and Defamatory Statement

Malice refers to the state of mind behind the false statements made against an individual. It implies that the person making the false statements did so knowingly, with the intent to cause harm or injury to the reputation of the individual being targeted. Malice can take various forms, including personal animosity, spite, or a deliberate attempt to deceive or manipulate others. It establishes that the false statements were not merely the result of a mistake or misunderstanding but were made with malicious intent. This distinction is crucial because it elevates the seriousness of the defamation and can result in more severe consequences for the party responsible.

Councilman Ash-Shafii made defamatory statements, including the claim that Mr. Menge was a thief and stole from the Highland Park Drug Forfeiture Fund. Furthermore, he referred to Mr. Menge as *"no good."* There is no proof to establish the radical claim. When Dennis Whittie, a long time business partner, filed a FIOA application to receive the documents which Councilman Ash-Shafii claimed proved his allegations, no such documents were produced to Mr. Whittie. These allegations have severely damaged Mr. Menge's ability to conduct his profession and has ended the prospect of becoming a police officer again.

Furthemore, Councilman Ash-Shafii's intent of malice is reinforced and rooted in the fact that he also accused Mr. Menge of stealing cars from the police impound. The current Chief of Police James McMahon noted that its not even *"possible because the cars go to the impound lot, they're controlled and auctioned by the owner of the tow company, so he (Brian Menge) doesn't have access to sell cars from the impound lot."*

The councilman has been making these allegations to people across the town without any proof, further proving that the fact that Councilman Ash-Shafii is maliciously making the defamatory statements.

Commenting on the same, Ron Dupuis, a police officer at Highland Park who worked in the narcotics department with Mr, Menge, noted that the *"statements were made knowingly that they were false."* Furthermore he stated the statements were brought up *"knowing that it'll be put up*

*on YouTube. As it could've been a closed door meeting or an investigation first before disclosing it to the public, but they choose not to do so."*

As someone who has served the community in the past as a police officer and also provided testimony to the court as an investigator, Councilman Ash-Shafii's false allegations are particularly damaging and have had a far-reaching effect on Mr. Menge's ability to lead a normal life.

## Amplified Impact of Defamatory Content on Social Media

Traditionally, the impact of defamation was limited to the geographic reach of a given newspaper or magazine, or more widely on TV and radio—but still limited compared with defamation on social media. Traditionally, defamatory statements spread only as far as the readership or viewership is in question.

What's more, when defamation did occur, it could be dealt with. If a newspaper printed false accusations against you, you could contact the editors and get a retraction, and even an apology, and get similar corrections for false content on television and radio. And readers and viewers were likely to see those retractions and corrections.

All that changed when social media came along. A false statement made on social media platforms like Facebook and X (Twitter) can instantly be shared with thousands or millions of users and upend a person's life before he or she even learns of the defamation. Social media knows no bounds.

And share is the keyword. People are quick to share posts of scandal on social media, thinking only about the appeal and not about the truthfulness of the content. Social media also causes accusations to evolve. What starts as a rumor soon becomes news, which if it goes viral, becomes then a new story in itself.

This is behavior that the platforms thrive on and encourage. Every time you open Facebook or X or Instagram, the platform provides you with a feed of content, a feed based not on the truthfulness of information but on popularity and your social media habits. A reckless comment can quickly snowball into a destructive scandal that takes on a life of its own.

Video-sharing sites like YouTube add yet another dimension since video representations can be far more compelling and convincing than merely text. When Google purchased YouTube for $1.6 billion in 2006, the company was betting big on *"homemade video"* but it followed the acquisition with additional investment in content producers, and YouTube became a huge success. Today the platform hosts some 3.9 billion videos—videos the site encourages users to share on other platforms.

All this leaves the door open for abuse. A person with a grudge or a bone to pick can spread false accusations far and wide with the click of a mouse, as can a person unintentionally, perhaps making a careless comment that gets sent around on social media.

Just as with traditional defamation, victims can sue when defamed online. Often, such cases turn to digital forensics to measure the extent of the harm—a process that directly illustrates how much social media amplifies defamation. The process involves examining such factors as who shared the content, how many followers they have, how many likes and reposts it garners, and in which geographical areas.

Geography matters. Defamation cannot be undone. The stain of the suggested scandal remains even after accusations are proven false. Victims of defamation face loss of employment, loss of business, the inability to find new work, as well as stigma among family, friends, colleagues, and strangers. It is relevant to state that another repercussion of defamation is the impact on one's mental health. This often translates into stress, depression, and such health issues as eating disorders and insomnia.

Traditionally, victims of severe defamation could find some relief in relocating beyond the reach of local newspapers and TV stations. But social media is nowhere as forgiving. A scandal Chicago doesn't stay in Chicago. If it involves a teacher, schools around the country will read about it, if it involves a police officer, police departments everywhere will see it, and if it implicates an accountant, financial firms far and wide will be apprised.

The impact that social media has on defamation cannot be overstated. The harm that can be done to someone's reputation is more and usually permanent, making such defamation, whether malicious or unintentional, deplorable.

While considering all of the above, the reputation harm to Mr. Menge is so much worse. Since the content has been shared on YouTube and Facebook, the content has reached a far wider audience. Furthermore, the content was uploaded by the official account of the city of Highland Park, giving the content a wider reach and trust.

Many of Mr. Menge's close acquaintances and friends found the defamatory content through social media and one's who didn't, were told by people who watched it. They were also

approached by people who watched the defamatory content, to clarify on the situation and talk more about it. Mr. Heaney stated he *"had quite a few conversations with people that have either seen it or heard about it."* Similarly, Mr. Dupuis noted that people would come up to him and say *"do you know this guy? I heard, you know, that he stole money or this, you know, this or that. It comes up in conversation. Yeah, definitely."*

As an investigator working in Highland Park, Mr. Menge's professional situation has also suffered harm. His credibility in court, an important aspect of his profession, has come into question, making it harder for attorneys to hire him. Due to the content being online, many of the attorneys Mr. Menge worked for, were able to find the video, watch it and form their own conclusions.

## Section 4: Freedom of Information Act (FOIA) Request

-----------------------------------------------------------------------------------------------------------

OVERVIEW OF FOIA REQUEST

RESPONSE FROM THE CITY OF HIGHLAND PARK

ANALYSIS OF DOCUMENTATION AND LACK THEREOF

## Overview of FOIA Request

FOIA is the Freedom of Information Act that came into effect in 1967. The State of Michigan similarly enacted its Freedom of Information Act in 1977 which guaranteed that the public has access to public records of government bodies at all levels in Michigan.

According to the procedure, once the city council's FOIA coordinator receives a written request adequately describing a public record, individuals are entitled to inspect, copy, or obtain copies of the requested public record from the public body.

Upon receipt of a FOIA request, the public body must respond within five business days. Alternatively, if necessary, the public body can issue a written notice to extend the response time by an additional 10 business days.

In the State of Michigan, over 10,000 public bodies, including the city council[2], are obligated to adhere to FOIA regulations.

---

[2] https://www.legislature.mi.gov/documents/mcl/pdf/mcl-act-442-of-1976.pdf

## Response from the City of Highland Park

After Mr. Whittie heard the allegations and spoke to Mr. Menge, he decided to do his due diligence to verify if such documents existed. He filed for an FIOA to the City of Highland Park on April 7th, 2023, under the company Grand FOIA Service, owned by his wife, Angel Whittie.

The FIOA requested that all public documents created by the City of Highland Park, its former mayor, administration, or any other person with the City of Highland Park or its council members or employees possess with regards to Councilman Khursheed Ash-Shafii, unequivocal statements regarding former Highland Park Police Officer Brian Menge and how he was caught stealing from the forfeiture fund.

Mr. Whittie received no documents from the City of Highland Park. Furthermore, on following up with the City's legal counsel, Delphia Burton, she replied and noted that no such request existed. She further stated that either she or Everett Monroe (an employee at the legal office) would forward a formal letter on Monday to retrieve the documents on the allegation. But Mr. Whittie received no documents or reply to his email since, the last email received by Mr. Whittie was on April 21, 2023.

## Analysis of Documentation and Lack Thereof

Despite the spirited claim of Councilman Ash-Shafii that documents proving Mr. Menge's lack of ethics existed, none were received when the FIOA was filed. The Office of the City Clerk has also claimed that no such FIOA was received, contrary to the proof of FIOA being filed. Despite follow-ups and communication, neither the documents nor confirmation of their non-existence were provided.

While speaking to Mr. Dupuis noted that there's a thorough system to ensure the fund is not stolen. He added that the fund has a *"very thorough accounting system and cross-referenced, so much so that it's very unrealistic the way it was portrayed as even being possible."*

Furthermore, no documents were provided to prove the accusation against Mr. Menge regarding the misappropriation of funds from the Drug Forfeiture Fund. Consequently, it appears that the defamatory claim was said to hinder Mr. Menge's prospects of pursuing a career as a police officer in the city. Moreover, this action also negatively affected his profession as a private investigator.

## Section 5: Elements of Rehabilitation Program

---------------------------------------------------------------------------------

An Investigator's Reputation Being Instrumental to their Credibility

Rebuilding a Damaged Reputation

Niche Sphere of Business

Regaining Credibility in Court

Relationship Between Lawyer and Plaintiff

## An Investigator's Reputation Being Instrumental to their Credibility

Certain occupations rely on public trust: For these jobs, a reputation for honesty and integrity is a prerequisite for just getting by and certainly for success. This is true for attorneys, accountants, teachers, and certainly investigators.

People turn to attorneys when they are facing problems, and they choose their attorneys based on trust. The attorneys will then make trust a key qualification as they build out their legal teams. From expert witnesses to investigators, they will expect the people they bring on to be trustworthy to the clients and importantly to the court and the case.

An investigator's trustworthiness is necessary in the investigation, in the case documents, and on the stand.

### Sensitivity of a investigator's reputation

It is perhaps damaging to the entire case if it is learned that an investigator, expert witness, or any other member of the team working on the case, has a mark on their record. Thus any mark on an investigator's record is debilitating: It makes current and future employment difficult if not impossible.

This is especially true if the *"mark"* in question is an accusation of theft. Stealing is an offense serious enough that even if unproven, can shut down the livelihood of investigators. It is worthwhile to note that the accusation carries more weight if it is made by a public official, and more so if made in the performance of an official's duty.

### Niche Sphere of Business

A damaged reputation can have significant consequences, as the close-knit nature of the niche community means that negative perceptions can spread quickly and have lasting effects. Rebuilding a damaged reputation in a niche sphere of business requires a tailored approach, which includes taking into account the specific dynamics and challenges of the industry.

In the specialized field of investigations, credibility is paramount. Mr. Menge's ability to effectively conduct his profession has been severely hampered by the false accusations of theft

from the Highland Park Drug Forfeiture Fund. These allegations not only undermine Mr. Menge's integrity but also cast doubt on the reliability of his investigative work.

**Particular harm to Mr. Menge's reputation**

Mr. Menge would often receive clients from referrals from his long time partners such as Mr. Whittie, but even that is difficult to source from due to the false statements. Commenting on his ability to refer Mr. Menge to other attorneys and colleagues, Mr. Whittie noted that even though he knows Mr. Menge didn't steal, he would hesitate as they would *"come back and say, Dennis, there was baggage with that."*

Furthermore, the online dissemination of the defamatory statements exacerbates the damage to Mr. Menge's professional standing. Attorneys, who are potential clients for his investigative services, hesitate to hire him due to concerns about his credibility. The availability of the content online allows these attorneys to form their own opinions, further complicating Mr. Menge's ability to regain trust in his niche sphere of business.

Similarly, Mr. Whittie also commented on the difficulty of regaining credibility due to the nature of his profession. He noted that *"regardless of the truth it's like toothpaste, you can't put it back in the tube type, once it's out there it's out there i think it'll forever be like poison eating at the bottom."* Additionally, Mr. Ochs also noted due to nature of the profession, he didn't even have to watch the video to hear the allegations, since *"everyone at work talks about it."*

In essence, Councilman Ash-Shafii's unfounded allegations have not only harmed Mr. Menge's personal and professional reputation but have also directly impacted his ability to operate within his specialized (niche) field of investigation in Highland Park.

## Rebuilding a Damaged Reputation

The defamatory statements made by Councilman Ash-Shafii, including baseless accusations of theft from the Highland Park Drug Forfeiture Fund and derogatory remarks, have significantly tarnished Mr. Menge's reputation. As a former police officer and a trusted investigator, Mr. Menge's ability to conduct his profession and pursue career opportunities, such as returning to law enforcement, has been severely hindered.

The impact of these false allegations extends beyond mere reputational damage. Mr. Menge's credibility in court, crucial for his profession as an investigator, has been called into question, making it increasingly difficult for attorneys to enlist his services. The availability of the defamatory content online has further exacerbated the situation, allowing many of the attorneys Mr. Menge previously collaborated with to form negative perceptions based on unsubstantiated claims. Commenting on the availability of the video on Facebook, Mr. Heaney noted that *"Current officers and former officers all watch that. I mean, It's advertised on their Facebook page. It just takes one person to see it and... it spreads like... It spreads."*

Commenting on the difficulty of rebuilding a damaged reputation as someone who is part of the law enforcement, Mr. McMahon noted:

> *"Your integrity is everything. So, for someone to make a false allegation against you, even though at some point you may be able to prove it's not true, that stigma is always out there."*

Rebuilding a damaged reputation in such circumstances requires a multifaceted approach including investing in a rehabilitation campaign. This process of rebuilding is referred to as online reputation management (ORM), which includes strategy and tactics to present personal or professional brand in the best possible light at all times on the internet. It involves promoting positive brand messaging and proactively managing negative criticism in the most appropriate manner. More specifically, Blue Ocean Global Technology defines ORM as the process of building, monitoring, and repairing the digital content that appears when you (or your company) are searched for on the internet. Some of the steps in ORM include:

**Build:**

Building and managing your online reputation means proactively influencing the impression left on internet users, especially those who are actively or reactively seeking to learn more about you. Building a strong online reputation is critical to both people and businesses seeking to market themselves, and grow.

An effective Online Reputation Management (ORM) strategy will protect your personal identity and brand from negative information appearing on search results. In this case, a building strategy would include employing strategies to mitigate the impact of the defamatory content online, such as seeking removal or correction of inaccurate information, promoting positive content highlighting Mr. Menge's accomplishments and professionalism, and actively engaging with online communities to address concerns and misconceptions.

**Monitor:**

Monitoring includes proactive anticipation of potential crises is the most effective way to mitigate or even completely avoid negative fallout. To put it simply, you need to be aware of what people are saying about you online, and the most effective way of doing this is continuously monitoring mentions of your identity on the internet. This is more complicated than reputation building, and more difficult than just assigning someone to review and post on your behalf on social media. It should include not only full and continuous oversight of your internet presence, but also an evaluative comparison of your actual online reputation to the narrative you are trying to create for yourself. Monitoring is the key to addressing potentially harmful rumors and falsehoods before they erupt into full-blown crises.

**Repair:**

There are several strategies available to repair a digital reputation. Digital reputations are constantly evolving, and it has become necessary to adapt personal and/or professional online presence accordingly. Digital reputation repair is a continuous process that demands periodic reassessment, the addition of new digital tools when appropriate, and modifying said process according to updates and changes to various search engines' algorithms for ranking content.

An integrated team of professionals, including technical experts, analysts, engineers, and programmers, consistently study and navigate digital trends in analytics, keyword research, link

analysis, and SERPs, to conduct highly efficient and effective SEO campaigns. Keywords & URL targeting may be used to mitigate negative links and safeguard against future damage to your reputation.

In a reputation repair and rehabilitation campaign, the focus is on proactively improving upon a reputation that was obviously harmed and viewed by clients and prospective clients.

Since the video in question is still up on the Facebook page and open for people to view, engage, share and indulge with, it is relevant to note that Mr. Menge is still, to this date, enduring reputational harm as a direct result of the video. He is still exposed to continued harm.

Hence, rebuilding a damaged reputation requires a strategic and proactive approach that addresses legal, public, professional, and online dimensions of the issue. By taking decisive action and demonstrating integrity and excellence in his profession, Mr. Menge can gradually restore his standing and reputation within the community.

## Regaining Credibility in Court

Private investigators often play a crucial role in court cases, providing valuable elements needed to back legal arguments before judges and juries. But everything they do hinges on trust: If anyone involved in the process has any doubts about an investigator's credibility, his or her involvement in the case can do more harm than good. Once an investigator's credibility and ethics are attacked, his or her reputation can be difficult, expensive, and often impossible to fully repair.

Private investigators fill many roles in cases and the courts. They can focus on cases more exclusively over longer periods than standard investigators. They enjoy several advantages: anonymity, experience, time, and freedom. Here's a look at some of the tasks private investigators perform in cases and courts.

- Evidence gathering. Private investigators are trained professionals who can pursue cases in greater detail, uncovering key facts that may decide case outcomes. That evidence is then presented to the court, backed by the investigator's credibility.

- Locating witnesses. Private investigators can locate and interview witnesses often on a grander scale than standard probes.

- Background checks. Using computers, phones, and personal visits, these investigators can better explore people's backgrounds including employment history, criminal history, conflicts of interest, and other factors.

- Financial probes. The phrase *"follow the money"* is common for a reason: It often leads to the truth. Private investigators are trained to follow money trails, uncover hidden assets and fraud, and provide evidence in court.

- IP infringement. Private investigators have long manned the front lines in intellectual property investigations, locating sellers of pirated goods and trade secrets and, backed by their reputations, presenting this evidence to courts.

- Expert testimony. Like expert witnesses, private investigators can provide invaluable testimony to courts, helping judges and juries sort through facts, finances, and sequences of events to get a fuller view of circumstances.

In all of these tasks, the value the investigators offer is limited to their reputation. Any stain on their record puts the information they gather and provide into question.

Evidence gathered by private investigators is usually admissible in court—but it is often attacked. Such attacks are the job of the lawyers on the other side of the case. As those attorneys build their case, they ask, what can I do to discredit witnesses including material witnesses, expert witnesses, and outside investigators?

This puts private investigators at constant risk of malicious attacks. False accusations of impropriety create immediate stains on their records, destroying their credibility in current cases and hampering their ability to be of use in future cases.

When this does happen, their only recourse is a concentrated campaign aimed at rebuilding that trust, a lonely uphill battle that is expensive and time-consuming. These investigators must regain the trust of judges and courts, and of the lawyers who might hire them. And even once they get started, they will have to operate knowing the false allegations can come back to haunt them at any time.

Private investigators walk into courtrooms always knowing that opposition lawyers are looking to discredit them and will raise any and all allegations, even claims long ago proven false, to win their case. In every case, these investigators put their reputations, indeed their very livelihoods, on the line.

As was stated by a close friend of Mr. Menge, Mr. Whittie noted the negative accusations can be used by the opposing counsel to discredit Mr. Menge and make his testimony less credible. He had also mentioned that these allegations were heard and believed by other attorneys, including a prosecutor who had worked with Mr. Menge in the past.

Similarly, Mr. Dupuis stated that it will be very difficult for him to regain credibility in court as a private investigator as *"it's one of those things where, kind of still follows you, still sticks to*

*you."* He further added that Mr. Menge will have to continue to justify again and again even if it's proven false.

Credibility in the court is a very delicate factor and Mr. Menge had established it over the years by testifying in numerous cases, but due to the false statements, his hard-earned efforts have been damaged.

## Relationship Between Lawyer and Plaintiff

Mr. Whittie and Mr. Menge had a strong partnership when it came to investigative work. He has already worked with Mr. Menge in law enforcement and then went on to hire him as an investigator in many of his cases.

They worked together on at least 20 cases since first starting off. Even when the allegations against Mr. Menge arose, Mr. Whittie was surprised to hear them and filed a FIOA application to determine if the allegations were true.

In the end, the allegations were damaging to the professional relationship between Mr. Whittie and Mr. Menge. Between the period of April 7th to 21st, there were around two cases in which Mr. Whittie did not use Mr. Menge. But he further stated that he still didn't use Mr. Menge as an investigator due to the negative information regarding him out there.

Generally, Mr. Whittie would highly recommend Mr. Menge to other attorneys, but he felt the situation was far different now.

While Mr. Whittie did start using Mr. Menge again, he still felt reluctant to do so, he noted:

> *"I was still waiting to see if the state police were going to investigate or whatever because if it was under a state police investigation, obviously, I couldn't use him as a witness in a case."*

Considering how damaging the allegations were to one of Mr. Menge's strongest professional relationships, it's necessary to consider the false allegations in a stricter light.

## Existing Reputation of Brian Menge to Build upon

---

Despite the negative narrative being propagated by Councilman Ash-Shafii, Mr. Menge still has goodwill left to build upon. Mr. Menge is a US veteran who served in the United States Coast Guard from 1994 to 1998 before being honorably discharged. Furthermore, he served as police for 25 years, including the time he served as detective for Ecorse, ran the Detective Bureau in Highland Park and worked on thousands of cases. Throughout his tenure, he investigated 87 homicide cases and three commendations for his work

Furthermore, in 2015, the ex-Chief of Police, Kevin Coney asked him to assist another detective in narcotics to help address the growing issues of narcotics dealing and its associated violent crimes within the city. He was chosen for this task due to his integrity and work ethic. He was also a member of the SWAT team and had never been disciplined or had any complaints about his work until the former Mayor Yopp came into picture.

He left Highland Park under duress but in 2022, he was asked to come back to the force under the impression that he would be brought back to run the Detective Bureau, as they still need an experienced investigator, according to Chief McMahon.

Additionally, he received positive feedback from the Chief of Police of Erie Township, he noted:

*"I have known Brian for over 20 years on both a personal and professional level. During my time knowing Brian, I have experienced an individual that shows up earlier than asked, works hard, and carries himself in a professional, polite, and calm manner. In addition, Brian is a professional that always presents himself with a level head and grace."*

Even the current Wayne County Prosecutor didn't shy away from praising Mr. Menge, she stated:

*"Brian's willingness to put in whatever effort is necessary to put a case together, especially when the crime involves the community's safety has impressed me since we first handled cases together. He has worked long hours on cases assigned to him and stepped in to help on cases assigned to other detectives."*

While noting her appreciation for Mr. Menge's selflessness, she added that he was always open to feedback and willing to learn and grow professionally. She further commented:

*"Just as importantly, he understands the constraints on law enforcement and respects the rules that apply to him. Serious cases can generate a lot of pressure on detectives that sometimes translates into a willingness to bend or skirt the constitution. Brian does not bend to that kind of pressure."*

Even Dr. Joseph Zambo, Mr. Menge's therapist noted the integrity he worked with, and how it was key to his role as public servant. Dr. Zambo stated:

*"He has a high degree of integrity. And what I mean by integrity is he does what is right. It appears to me that he, again, ethically minded, professionally minded, morally minded."*

The comments further indicate Mr. Menge's respect for the law and unwillingness to bend to pressure. Based on all the quotes mentioned before, including the ones above, it's clear that Mr. Menge is highly respected and trustworth among the law enforcement community. Their opinion of him also showcases his desire to uphold the law and protect the community.

**Section 6: Legal Cases**

--------------------------------------------------------------------------------------------------------------------

Defamation Per Se

Defamation Through Social Media

Intent of Malice

*Disclaimer: Please note that I am not making any legal conclusions and/or providing any legal advice. All information, content, and materials available hereunder are for informational purposes only, in furtherance of the expert testimony being provided.*

## Defamation Per Se

**Bongiovi v. Sullivan, 122 Nev. 556, 138 P.3d 433 (Nev. 2006)**

1. Brief Facts:

   Jones, an exotic dancer in Las Vegas, Nevada, consulted with multiple doctors, including Bongiovi and Sullivan, for plastic surgery to enhance her appearance. During her consultation with Bongiovi, he falsely informed Jones that Sullivan had a patient who died during a similar surgery that Jones was planning to undergo. Bongiovi claimed that Sullivan's negligence was responsible for the patient's death and that he was a consultant for a board investigating Sullivan's misconduct. These statements were made in private, with no witnesses other than Jones's infant child. Jones contacted Bongiovi's office again to confirm the statements, and Bongiovi's office assistant reiterated that the statements were true.

   Sullivan emphasizes that the false statement struck at the core of his profession as a plastic surgeon. Patients seeking plastic surgery often research and consult with multiple surgeons before making a decision. Sullivan relies heavily on word-of-mouth referrals, which account for eighty percent of his business. The statement, therefore, had the potential to seriously damage his practice.

   Sullivan points out that a significant portion of his clientele consists of exotic dancers, who are known for sharing information and rumors among themselves. Given the nature of his clientele, the false statement was particularly damaging to his practice.

2. Relevant Information:

   Defamation harmed Sullivan's business primarily by negatively affecting word-of-mouth referrals. Bongiovi's false statements damaged Sullivan's professional reputation, making it less likely for satisfied patients to recommend him to others, which significantly impacted his practice which heavily relied on such referrals.

3. Judgment:

The court noted the proportionality of the punitive damages awarded to Sullivan. It acknowledges that Sullivan suffered significant emotional harm and a loss of business due to Bongiovi's actions. The amount of punitive damages awarded was representative of this harm.

The jury awarded him $250,000, which was half of his request and one-third of the maximum they could have awarded. The court concludes that this award was not excessive because it was reasonable and proportionate to the harm suffered by Sullivan and was consistent with the compensatory damages awarded.

4. Relevance to the present case:

The case of Bongiovi v. Sullivan shows how damaging false statements can be to a person's professional reputation and business. In that case, the false statements hurt Sullivan's business by making it less likely for people to recommend him to others. Similarly, Mr. Menge's reputation as an investigator was hurt by false accusations, making it harder for him to get clients like Mr. Whittie.

Just like Sullivan, Mr. Menge faced difficulties in maintaining his professional credibility because of false accusations. This made it hard for him to gain trust and attract clients like Mr. Whittie. Sullivan's case also shows how defamation can affect more than just money—it can impact career opportunities and advancement. Similarly, Mr. Menge faced obstacles in maintaining his career due to the damage to his reputation caused by the false allegations. Additionally, Sullivan's experience suggests that defamation can strain personal and professional relationships. Similarly, Mr. Menge also encountered challenges in his interactions with the legal and investigative community after the defamation incident.

In addition to the monetary damages awarded in Bongiovi v. Sullivan, another relevant aspect is the recognition of emotional harm suffered by Sullivan due to the defamation. This acknowledgment underscores the non-financial impacts of defamation, which could also be applicable to Mr. Menge's situation. He experienced emotional distress and

professional setbacks beyond just financial losses, which should be considered in assessing the overall impact of the defamation on his life and livelihood.

**Roland Van Liew v. Philip Eliopoulos 92 Mass. App. Ct. 114 (2017)**

1. Brief Facts:

In 2007, Chelmsford's fire department and Department of Public Works began considering options for a new fire station headquarters. One of the sites considered was a 2.41-acre property near the center of town, owned by Eastern Bank (the *"Property"*. Ultimately, however, the fire department and Department of Public Works decided not to purchase the Property.

In 2008, a local real estate developer, Michael Eliopoulos, approached the bank about purchasing the Property. Michael negotiated the sale of the property with Eastern Bank. Philip, Michael's son and a real estate lawyer, reviewed the draft agreements for his father and served as his real estate counsel. For a part of these negotiations, Philip remained in his position as Chairman of the Board.

In 2009, after his Board term ended, Philip aided Michael in Property development. They devised a plan to renovate a historic house and build a four-unit office building. Philip represented Michael's corporation in permit processes and hearings before various commissions and boards. The project faced strong opposition led by local business owner Roland Van Liew. He criticized Philip for self-dealing and conflicts of interest, alleging violations of ethics laws. Van Liew's tactics included mass emails, letters, DVDs, website posts, newsletters, signs, bumper stickers, newspaper letters, automated calls, and video recordings. He aimed to depict questionable dealings in Chelmsford's government.

2. Judgment:

At trial, the jury found Van Liew liable for defamation and awarded Philip 2.9 million dollars in damages. Later, Van Liew appealed the decision to the Appeals Court.

The central thrust of the Appeals Court decision dealt with whether Philip proved the elements of defamation of a public official. The Appeals Court ultimately held that the evidence was sufficient to support the jury's finding that Van Liew defamed Philip.

Concerning Philip's time as Chairman of the Board, Van Liew had alleged that *"Eliopoulos was simultaneously serving as Chairman of the [Board] and voted against [Chelmsford] purchasing [the Property!]"* in 2009. Van Liew's statement in this regard was false, as neither Philip nor the town voted against purchasing the property in March of 2009, or at any other time. Van Liew knew this statement to be false because he admitted at trial that *"he had possession of the board minutes and had watched the video recording many times before making and repeating the false statement about the board vote."*

The decision was upheld, and it was affirmed that the jury's award of reputational and emotional distress damages, amounting to $2.9 million, was neither punitive, disproportionate to the injuries proved, nor excessive.

3. Ratio:

To prove defamation, a plaintiff must establish that *"the defendant was at fault for the publication of a false statement... regarding the plaintiff, capable of damaging the plaintiff's reputation in the community, which either caused economic loss or is actionable without proof of economic loss."*

In determining whether an assertion is a statement of fact or opinion, *"the test to be applied ... requires that the court examine the statement in its totality in the context in which it was uttered or published. The court must consider all the words used, not merely a particular phrase or sentence. In addition, the court must give weight to cautionary terms used by the person publishing the statement. Finally, the court must consider all of the circumstances surrounding the statement, including the medium by which the statement is disseminated and the audience to which it is published."*

*"A plaintiff in a successful defamation case is entitled ... to fair compensation for actual damages, including emotional distress and harm to reputation (and any special damages that have been pleaded and proved)."*

4. Relevance to the present case:

The case of Roland Van Liew v. Philip Eliopoulos highlights how false statements can significantly damage a person's professional reputation and business prospects. Just as Philip Eliopoulos faced defamation that hindered his real estate dealings, Mr. Menge's reputation as an investigator was tarnished by false accusations, impacting his ability to secure clients like Mr. Whittie. The substantial damages awarded in Eliopoulos's case underscore the seriousness of reputational harm caused by defamation, providing a framework for assessing the impact on Mr. Menge's career and livelihood.

The court's analysis of Eliopoulos's case emphasized the importance of examining statements in their full context and considering all surrounding circumstances. This approach helps determine whether a statement is actionable and supports the jury's finding of actual malice. Applying this principle to Mr. Menge's case It is clear that several attempts were made to check the veracity of the document talked about by the councilman but in vain, to date, there is no evidence about the existence of documents as per the allegations made.

Furthermore, Eliopoulos's case recognized the non-financial impacts of defamation, such as emotional distress and harm to reputation. Similarly, in Mr. Menge's situation, it is crucial to acknowledge the emotional distress and professional setbacks he experienced due to false accusations. Recognizing these non-monetary impacts ensures a comprehensive assessment of the harm caused by defamation and supports fair compensation for Mr. Menge's losses.

**Hosmane v Seley-Radtke, 227 Md. App. 11, 20-21 (2016)**

1. Principle

A defamatory statement is one 'which tends to expose a person to public scorn, hatred, contempt or ridicule, thereby discouraging others in the community from having a good opinion of or associating with, that person.

2. Relevance to the present case

This principle can be aligned with Mr. Menge's situation. The false accusations made against Mr. Menge have led to him being viewed negatively by the public and potential clients, it could meet the criteria of defamation outlined in this case. The accusations have caused others in the community to question Mr. Menge's integrity and hesitate to associate with him, it would align with the definition provided in Hosmane v Seley-Radtke. This connection underscores the potential relevance of this legal precedent in evaluating Mr. Menge's case and determining whether defamation has occurred.

**Shapiro v. Massengill, 105 Md. App. 743 (1995)**

1. Facts

The case of Steven A. Shapiro v. Alan D. Massengill, et al., No. 999, Sept. Term, 1994, before the Court of Special Appeals of Maryland, revolved around an employment dispute between two attorneys. Shapiro was terminated from employment by Massengill and his law firm because Shapiro did not disclose during negotiations that his former employer was under federal investigation for fraud. Shapiro filed suit, alleging breach of contract, wrongful discharge, and defamation. The jury ruled in favor of Massengill and his firm on all claims. Shapiro appealed, presenting five issues for review, including questions about the nature of the employment contract, a duty to disclose investigations and defamation.

The factual summary revealed that Shapiro, while negotiating employment with Massengill, did not inform him of the investigation involving his former employer. Massengill terminated Shapiro upon learning of the investigation, despite Shapiro's explanation that he believed it to be insignificant and not pertinent to their discussions. Although Shapiro provided evidence from the Army's Special Agent confirming his innocence, Massengill opposed Shapiro's claim for unemployment benefits. The court's

discussion focused on whether the contract was at-will or for a fixed term, among other issues raised by the parties.

2. Held

In this case, the court differentiated between defamation per se and defamation per quod. In the case of words or conduct actionable per se their injurious character is a self-evident fact of common knowledge of which the court takes judicial notice and need not be pleaded or proved. In the case of words or conduct actionable only per quod, the injurious effect must be established by allegations and proof of special damage, and in such cases, it is not only necessary to plead and show that the words or actions were defamatory, but it must also appear that such words or conduct caused actual damage. Later in, Metromedia, Inc. v. Hillman, 285 Md. 161, 163-64 (1979), the court explained further that this distinction goes not to the truth or falsity of a statement—it goes to damages.

3. Relevance to the present case

In Mr. Menge's case, defamation per se occurred based on the legal precedent set in Shapiro v. Massengill. Defamation per se refers to statements or conduct that are inherently injurious and do not require proof of specific harm to be considered defamatory. In Mr. Menge's situation, the false accusations made against him are considered defamatory per se, their injurious nature is self-evident and does not need to be explicitly proven.

According to Shapiro v. Massengill, when words or conduct are deemed defamatory per se, their harmful impact is considered a matter of common knowledge recognized by the court without the need for additional evidence. Therefore, the accusations against Mr. Menge fall under defamation per se, it implies that their damaging nature is apparent and universally understood, requiring no further proof.

Furthermore, the distinction between defamation per se and defamation per quod, as clarified in Metromedia, Inc. v. Hillman, emphasizes that this classification is not based on the truth or falsity of the statements but rather on the extent of damages caused. Therefore, Mr. Menge's case falls under defamation per se, it signifies that the damaging

effect of the false accusations is so obvious and severe that it warrants legal action without the need for proof of specific harm.

## Defamation through Social Media

**Rouch v. Enquirer News Of Battle Creek. Supreme Court of Michigan. 440 Mich. 238 (Mich. 1992)[3]**

1. Brief Facts:

   The plaintiff, David Rouch, was arrested for first-degree criminal sexual conduct by the police, the defendant newspaper, the Enquirer News of Battle Creek, published an account of Rouch's arrest, the charge against him, and his release on bond. Rouch's charges were dropped and he filed against the inaccuracies in the newspaper report. The court decided whether the defendant published a materially false article.

2. Ratio:

   *"Michigan's law of libel requires an examination of the article as a whole. See Gustin v Evening Press Co, 172 Mich. 311, 314; 137 N.W. 674 (1912) ("To test its libelous quality, a publication must be considered as a whole . . ."); O'Connor v Sill, 60 Mich. 175, 181; 27 N.W. 13; 28 N.W. 162 (1886) ("The article . . . must all be read together. Parts of it cannot be severed . . ."). Read as a whole, the article conveyed the impression that there was overwhelming evidence and that judicial proceedings had been instituted against Rouch. The effect of this on the mind of the reader is different from that of a mere "apprehension." Rouch I, 427 Mich. 172. The "sting" that results from this impression of formal charges created a substantially different effect on the mind of the reader. The evidence demonstrated, and the jury obviously found, that the article as a whole conveyed an impression quite different from that which the actual truth would have produced."*

3. Judgment:

   The Court of Appeals reversed the ruling of the trial court, stating that the common-law privilege to report matters in the public interest was unavailable because the details of the

---

[3] https://casetext.com/case/rouch-v-enquirer-news/

alleged crime fell outside the scope of matters promoting the public interest and that the trial court erred in requiring a showing of malice.

The Court also held that the article was materially false. The jury returned a verdict in favor of the plaintiff and awarded damages of one million dollars.

4. Relevance to the case:

Although this case covers newspapers and their act of reporting criminal justice and police conduct, it examines the balance between protecting an individual's reputation from false and defamatory statements and fostering energetic, tumultuous public debate to ensure continued scrutiny of police, prosecutors, and the courts through cherished constitutional rights guaranteeing freedom of speech and the press.

**Reighard v. ESPN, Inc., 341 Mich. App. 526 (Mich. Ct. App. 2022)[4]**

1. Facts:

Reighard was the head women's gymnastics coach at Central Michigan University (CMU). On February 20, 2019, CMU announced that it had placed Reighard on paid administrative leave pending an investigation. No details regarding the investigation were disclosed in that announcement. Defendant Daniel Murphy is a reporter for defendant ESPN, Inc.

On February 21, 2019, Murphy posted on Twitter consecutive tweets about two public announcements concerning women's gymnastics coaches in Michigan. Reighard requested a retraction of the tweets. Murphy then searched for and discovered the earlier reporting in which CMU had confirmed that its investigation of Reighard had nothing to do with Nassar's case of sexual misconduct.

Murphy concluded that a retraction was unnecessary because there was nothing factually incorrect in the tweets. Instead, on March 11, 2021, he posted an additional tweet—which he testified was not meant as a retraction, but instead was intended to "add more

---

[4] https://casetext.com/case/reighard-v-espn-inc

information to [his] reporting''. Reighard filed suit, alleging that Murphy's initial tweets constituted defamation per se and false-light invasion of privacy.

2. Ratio:

*"We consider and would hold that a "public figure" who is not a public official may also recover damages for a defamatory falsehood whose substance makes substantial danger to reputation apparent, on a showing of highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers."*

*"No doubt, this new media world has many virtues—not least the access it affords those who seek information about and the opportunity to debate public affairs. At the same time, some reports suggest that our new media environment also facilitates the spread of disinformation. A study of one social network reportedly found that "falsehood and rumor dominated truth by every metric, reaching more people, penetrating deeper ... and doing so more quickly than accurate statements."*

3. Judgment:

The Court agreed that the tweets could reasonably be interpreted as connecting Reighard with sexual abuse allegations.

*"Particularly in light of the manner in which the statements contained within the tweets were juxtaposed with one another, that the implications complained of are capable of defamatory meaning."*

*"The implication that Reighard's placement on leave was related to allegations that Geddert had physically and mentally harmed gymnasts tended to harm Reighard's reputation so as to lower him in the estimation of the community or deter third persons from associating or dealing with him."*

4. Relevance to the case:

The defamation caused by Murphy happened on Twitter, he claimed his tweets were based on a source that Reighard had been placed on administrative leave and Reighard had a reputation for physically and mentally abusing gymnasts. It also mentions the impact of the dissemination of false information with technology.

Relating to the case at hand, both parties suffered from the defamatory statements posted online, which were particularly written about their conduct during duty. A false statement regarding such a sensitive topic can be quite detrimental to a person's reputation and quality of life, as has been demonstrated in this case.

**Aldous v. Bruss, 405 S.W.3d 847 (Tex. App. 2013)[5]**

1. Facts:

Eric Bruss, a police officer serving in the Santa Fe, Texas, police department, filed a defamation lawsuit against Michael Aldous in January 2009. Bruss alleged that in February 2008, he arrested Michael for driving while intoxicated (DWI). Later in the same year, another officer from the Santa Fe police department arrested Michael's father, Warren Aldous, for a traffic offense.

Following Warren's arrest, Michael allegedly began to repeatedly make and spread false statements about Bruss's professional reputation. Michael publicly accused Bruss of various criminal offenses, which Bruss claimed were untrue. Additionally, Michael disseminated false statements via email and on the internet. Bruss argued that these defamatory statements constituted slander per se, directly targeting his professional reputation and casting doubt on his honesty, integrity, and virtue, and were made with malice.

Bruss asserted that Michael intentionally published numerous false statements and falsely accused him of crimes. Bruss claimed that he suffered shame, public embarrassment, humiliation, and mental anguish due to Michael's false and defamatory statements, both

---

[5] https://casetext.com/case/aldous-v-bruss-4 and
https://search.txcourts.gov/Case.aspx?cn=14-11-01108-CV&coa=coa14

in the past and ongoing. Bruss sought compensation for actual and exemplary damages, as well as pre- and post-judgment interest, and legal costs.

2. Ratio:

   *"Bruss sued Warren for defamation per se. As is relevant to our analysis of the propriety of the trial court's damages award, Warren admitted to making false statements accusing Bruss of criminal acts and injury to his office, profession, and occupation. These type of statements fall within the categories of statements that are defamatory per se…. In such a case, the plaintiff is entitled to recover general damages, such as for loss of reputation."*

3. Judgment:

   The court upheld the judgment of the District Court, affirming Defamation Per Se. It noted that reasonable and fair-minded people could have determined that $150,000.00 would be a sufficient amount to compensate Bruss for the injury to his reputation caused by Warren's defamatory statements.

4. Relevance to the case:

   Similar to Mr. Menge, Bruss also suffered false statements regarding his professional reputation and was falsely accused of numerous criminal offenses. Bruss also had a good reputation within the law enforcement community before the defamatory statements. Furthermore, Mr. Menge had prospects of becoming a police officer and Buss had also applied for jobs in other police departments but had to withdraw his applications because of the defamation suffered. Finally, both of them had their work performance, reputation, and personal life affected by the false allegations.[6]

---

[6]
https://search.txcourts.gov/SearchMedia.aspx?MediaVersionID=ef6e2169-5804-48c1-8dcf-ee63d5f659b0&coa=coa14&DT=Opinion&MediaID=10dabd6d-5e3f-457d-884b-1c40a34d9253

## Intent of Malice

**Bouveng v. NYG Capital LLC 175 F. Supp. 3d 280, 336-44 (S.D.N.Y. 2016)**

1. Brief Facts:

   The plaintiff, Hanna Bouveng, brought this action against the defendants for quid pro quo sexual harassment, defamation, and two other claims. The plaintiff was employed with the defendant, wherein she alleged to have encountered several sexual overtures at the hands of Wey, her superior. On refusing to engage in sexual activities with him, Wey allegedly sent emails to her family and friends to humiliate her and terminate her employment. Later, Wey published six Blot articles containing 66 defamatory statements.

2. Judgment:

   The plaintiff was awarded $1.5 million on her defamation claim against all defendants, in addition to other damages awarded under her other claims in the suit.

   The jury further stated that "in the internet age in which we live, an individual's online presence is as important-perhaps more important early on—than her physical presence.

   Acting out of pure malice and spite, Defendants used the internet to ensure that no prospective employer would interview Bouveng, much less hire her, by intentionally disseminating scores of the most professionally damaging lies and falsehoods about her that they could conceive of. She is entitled to compensation for the damage Defendants have caused to her professional reputation, and they will not be heard to complain that she has not listed the interviews she never obtained, or the jobs she lost, as a result of their egregiously defamatory falsehoods. Having caused the harm, Defendants cannot escape the liability.

3. Ratio:

   It was held that "the unique nature of [defamation] cases is well established…. In actions for other torts there is generally... some standard by which the reasonableness of an award

of damages may be tested, but it is seldom so in actions for libel and slander where the elements of wounded sensibilities and the loss of public esteem play a part."

4. Relevance to the present case:

Like Bouveng, Mr. Menge suffered harm to his professional reputation due to defamatory statements made against him. The significant damages awarded in Bouveng's case indicate the seriousness with which courts view such reputational harm, which means Mr. Menge is also entitled to compensation for the damage caused to his reputation by the false accusations made against him.

The purpose of punitive damages, as highlighted in the Bouveng case, underscores the need to deter similar misconduct in the future. If Mr. Menge's case involves evidence of malicious intent or egregious behavior on the part of the defendants, punitive damages may be warranted to punish such conduct and discourage others from engaging in similar defamatory actions against individuals like Mr. Menge.

In Bouveng's case, the defendants intentionally disseminated false and damaging statements about her with the malicious intent of harming her professional reputation and preventing her from obtaining future employment. Similarly, the individuals who made false accusations against Mr. Menge did so with malicious intent, aiming to damage his reputation and hinder his ability to secure employment opportunities.

**Clayton v. Fairnak, No. JKB-18-2134, 2018 BL 455739 (D. Md. Dec. 10, 2018)**

1. Brief Facts:

Plaintiff Clayton is an independent contractor who provides services under contract to various federal agencies. Clayton was employed with Defendants through his corporate entity for some time, but, in August 2016, Defendants informed him that his services would no longer be required. He now competes with Defendants for government contracts.

Sometime after parting ways with Defendants, Clayton applied for increased security clearance from the federal government, which involved gathering information from

previous companies with which he'd worked, including Enterprise SI. In mid-December 2016, Defendant Fairnak and/or other agents of Defendant Enterprise SI returned a form to the U.S. Office of Personnel Management (OPM) stating that Clayton had been *"fired for cause."* According to Clayton, the statement was false, and Defendants made it either knowing it was false or negligently, with "the intent to harm Clayton's chances" of obtaining federal contracts.

Finally, Clayton claimed that Defendants' statement to OPM harmed *"his standing and reputation within his professional community,"* caused him "mental anguish and personal humiliation," and made it *"significantly more difficult"* for him to *"obtain necessary federal government security clearance now and in the future."* Clayton sought compensatory and punitive damages.

2.  Held:

To state a claim for defamation under Maryland law, a plaintiff must allege

    a.  that "the defendant made a defamatory statement to a third person,"

    b.  that "the statement was false,"

    c.  that "the defendant was legally at fault in making the statement," and

    d.  that "the plaintiff suffered harm."[7]

Failure to plausibly allege any one of these elements warrants dismissal. Although Plaintiff cleared the first hurdle by alleging a potentially defamatory statement, he failed to allege more than speculative harm under the fourth element.

3.  Relevance to the present case

Firstly, in Mr. Menge's case, the first condition is met as the defendant, Councilman Ash-Shafii, made defamatory statements about Mr. Menge during the Highland Park City Council Meeting on April 3, 2023. These statements were communicated to a third party, the attendees of the council meeting, and others who viewed recordings or heard about the allegations.

---

[7] Lindenmuth v. McCreer, 233 Md. App. 343 (Md. Ct. Spec. App. 2017).

Secondly, the statements made by Councilman Ash-Shafii were false since there is no evidence to support the allegations of theft from the Highland Park Drug Forfeiture Fund. The inquiry conducted by Mr. Whittie and the Freedom of Information Request didn't yield any results.

Regarding the third condition, Councilman Ash-Shafii's statements were made to discredit Mr. Menge's reputation and hinder his ability to return to law enforcement. Since the FIOA established that no documents proving the councilman's allegation exist, he knowingly made the false assertions. Considering these factors, Councilman Ash-Shafii displayed negligence in his statements.

Finally, Mr. Menge suffered harm as a result of the defamatory statements. The allegations made by Councilman Ash-Shafii damaged Mr. Menge's business relationships and reputation within his professional community, leading to financial losses and mental anguish.

**Section 7: Assessment of Damages**

---

RATIONALE FOR RECOMMENDATION OF DAMAGES BASED ON REPUTATIONAL HARM

SUMMARY FINDINGS

DAMAGES

# Rationale for Recommendation of Damages based on Reputational Harm

The rationale to determine damages and reputation harm involves evaluating the extent and severity of damage inflicted on an entity's public perception, credibility, and industry standing as a result of negative events, actions, or allegations. It includes analyzing various factors such as the nature and severity of the allegations or events, the visibility and reach of the information, the original position of the entity, and the reactions of and/or effects on key stakeholders such as employees, clients, or the public. Additionally, assessing harm to reputation involves considering the long-term implications and consequences for the opportunities and prospects of the entity.

**Examination of Impact of Defamatory Statements:**

The defamatory statements made by Councilman Ash-Shafii, labeling Mr. Menge as a thief who stole from the Highland Park Drug Forfeiture Fund and referring to him as "no good," have inflicted significant damage to Mr. Menge's reputation within his professional sphere.

- Impact on Professional Standing: As an individual with a background in law enforcement and a track record of providing testimony to the court as an investigator, Mr. Menge's reputation for integrity and trustworthiness is paramount to his success in the field. The false accusations of theft undermine this reputation, casting doubt on his credibility and reliability as an investigator.
- Diminished Trust: The baseless nature of the allegations erodes trust in Mr. Menge's character and capabilities. Attorneys and clients who once relied on his services may now question his integrity, leading to a loss of trust and confidence in his ability to effectively carry out his professional responsibilities.
- Career Implications: Mr. Menge's aspirations of returning to law enforcement have been jeopardized by the damaging nature of the accusations. The tarnishing of his reputation as a result of Councilman Ash-Shafii's statements may preclude him from pursuing career opportunities within the field, limiting his professional advancement and prospects for the future.
- Online Dissemination: The availability of the defamatory statements online exacerbates the harm to Mr. Menge's reputation. Potential clients, colleagues, and employers may

encounter these damaging allegations, further perpetuating negative perceptions and
hindering his ability to rebuild his reputation within his professional sphere.

- Psychological Impact: Beyond the tangible consequences on Mr. Menge's career and
professional relationships, the defamation has likely taken a toll on his mental and
emotional well-being. Enduring false accusations of criminal behavior and enduring the
resulting damage to one's reputation can be deeply distressing and may have long-lasting
effects on confidence and self-esteem.

The repercussions of these false accusations extend far beyond mere reputational damage,
impacting Mr. Menge's livelihood and future opportunities within his niche sphere of business.

This year, he has handled 158 investigations, with each case potentially bringing in significant
revenue. The minimum contract for his services is approximately $1,000 per hour for a 10-hour
investigation, highlighting the substantial financial implications. The false allegations have
caused attorneys to hesitate in retaining his services, directly affecting his income and
professional reputation.

The rationale for recommending damages, in this case, is grounded in the significant harm
inflicted upon Mr. Menge as a result of the defamatory statements made by Councilman
Ash-Shafii. Based on factors such as loss of income and opportunities, damage to reputation,
emotional distress and psychological impact, reputation management costs and future career
implications, it is recommended that damages be awarded to compensate to address the harm
caused to Mr. Menge.

## Summary Findings

1. **Damage has been caused to Mr. Menge's reputation due to defamatory statements made by Councilman Ash-Shafii.**

   Councilman Ash-Shafii made defamatory remarks on Mr. Menge's character, labeling him as a thief who stole from the Highland Park Drug Forfeiture Fund and referring to him as *"no good."* He also made allegations that Mr. Menge was stealing cars from the police impound and stealing them. These allegations have also spread like wildfire, as many of his old colleagues and the current chief of police are aware of them. Many of them noted how this allegation only makes the situation worse for Mr. Menge as it becomes even harder for him to rejoin the police force. Furthermore, these allegations damaged his private investigator profession as many of his opportunities were lost, including the cases given by Mr. Whittie.

2. **Exacerbation of false narrative through wrongful use of social media.**

   Social media - particularly Facebook was used to disseminate the frivolous accusations about Mr. Menge. The intent behind posting the said recording on Facebook was to garner more viewers and attention to the same accusations. The recording was made available to Mr. Whittie and many of the other attorneys who work at the court of the city of Highland Park. Many of the attorneys also worked with Mr. Menge in the past. The video was also observed by a prosecutor working in the same court.

   Furthermore, it was pointed out by many of Mr. Menge's ex-colleagues that city council meeting was viewed by mostly everyone in the police department at Highland Park. If not, it's discussed by many, which leads to the word about the info spreading, making others watch the video if it's noteworthy.

3. **Mr. Menge has endured significant economic damages as a direct result of the defamatory allegations.**

Due to the false claims made by Councilman Ash-Shafii during the city council meeting regarding stealing from the Drug Forfeiture fund and furthermore on the stealing cars from the police impound, many of his close colleagues including Mr. Whittie have been reluctant to hire him. Furthermore, his private practice has also taken a financial hit and his possibility of becoming a police officer at Highland Park has also diminished. All of these events have negatively affected his economic situation.

**4. Mr. Menge has and continues to suffer emotional distress and shall be entitled to appropriate damages.**

Since the city council meeting, the defamatory allegations against him have been spread across town, as many in the police department know about and so do many in his family, humiliating him. Additionally, the allegations have made him lose sleep and start taking therapy. Since his work is also suffering from the allegations, it's adding to his stress.

**5. Positive reputation of Mr. Menge prior to the allegations and necessity to undertake restoration measures.**

Before the allegations became public knowledge, Mr. Menge had established a strong reputation as a hardworking and honest detective. He was highly rated by the chiefs of police for whom he worked and was respected among his peers as well. The trust of his superiors extended to cases with a sensitive background, which he carried out with the utmost professionalism.

Since an online sweep of a new employee is essential, Mr. Menge is bound to live with the consequences of the false statements made at the council meeting. Since the court documents mention the recording of the council meeting referring to him as someone who stole from the Drug Forfeiture Fund, it's a stain that'll remain on his reputation.

Another critical point in addressing the reputational harm suffered by Mr. Brian Menge involves investing in an effective rehabilitation campaign. Such a campaign is essential to effectively respond to the damage caused by the defamatory statements and to actively rebuild his reputation. The campaign would encompass several strategic initiatives,

including public relations efforts, social media management, and professional endorsements, all aimed at restoring Mr. Menge's standing in his professional community.

The objective of this campaign is to create a positive narrative around Mr. Menge, emphasizing his integrity, professionalism, and contributions to the field. By disseminating factual and favorable information about his career and achievements, the campaign can counteract the false allegations and help reestablish trust among his peers, clients, and the broader community.

Moreover, the rehabilitation campaign would facilitate the reparation of professional relationships that have been damaged due to the negative publicity. It would engage with key stakeholders and influencers in the legal and law enforcement sectors to endorse Mr. Menge's character and work ethic, thereby reaffirming his credibility.

Investing in such a campaign not only addresses the immediate reputational harm but also provides a long-term strategy for sustaining Mr. Menge's professional image. This proactive approach is crucial for mitigating the adverse effects of the defamation and ensuring that Mr. Menge can continue his career with restored confidence and respect in his industry.

## Damages

### Economic Damages

Economic damages refer to the financial losses incurred by the plaintiff as a result of false and damaging statements made about them. These damages typically include quantifiable losses such as lost wages, loss of business opportunities, and damage to reputation leading to financial harm. In defamation cases, economic damages aim to compensate the plaintiff for the tangible financial repercussions of the defamatory statements.

Firstly, the false allegations made by Councilman Ash-Shafii have directly affected Mr. Menge's ability to secure employment and conduct his business effectively. As an investigator, Mr. Menge's credibility and reputation are crucial for attracting clients and contracts. The defamation has resulted in a loss of income and opportunities for Mr. Menge, as potential clients may hesitate to hire him due to concerns about his credibility and integrity.

Commenting on the number of cases Mr. Menge lost, Mr. Whittie noted:

> "I passed them up probably on 9 or 10. And that was in a short amount of time because as soon as I felt comfortable using them again, I did immediately. But there was a lot more. So on average, in each case, at a minimum is going to be a $1000. It generally is about 10 hours of work."

Hence the contracts he has lost from Mr. Whittie amount to atleast $9,000 - $10,000. During my conversation with Mr. Menge, he stated that this number is just with respect to one attorney. Considering that Mr. Menge often worked and partnered with other attorneys, such as Lillian Diallo, this incident may have discouraged them to hire him for other projects. Henceforth, it is important to mention that there were in all probability, more opportunities and potential contracts he lost out on.

Secondly, Mr. Menge's reputation within his professional circle has been significantly damaged by the defamatory statements. This not only impacts his current livelihood but also has long-term implications for his career path. The loss of trust and confidence in Mr. Menge's abilities as a

result of the false accusations can impede his prospects and opportunities for advancement within his field.

For instance, Mr. Menge, a seasoned investigator, has been significantly impacted by the defamatory statements made against him. In his professional capacity, Mr. Menge has been retained by various attorneys, including Lillian Diallo, for numerous cases. This year alone, he has conducted 158 investigations. Each investigation varies in scope, with some contracts ranging from a minimum of 10 hours, costing around $1,000 per project, along with variables such as extended investigation time increasing the cost. This demonstrates not only the high demand for Mr. Menge's services but also the substantial financial stakes involved in his line of work. The false allegations have jeopardized his ability to secure these high-value contracts, causing a direct economic impact on his livelihood.

Lastly, the defamatory statements could have enduring effects on Mr. Menge's career trajectory and future opportunities. The damage to his reputation may hinder his ability to secure employment or contracts in the future, impacting his earning potential and professional growth.

Hence the economic damages can be divided into three categories:

1. The contracts that he lost from Mr. Whittie, which amounts to $9,000 - $10,000.
2. Mr. Menge lost a significant chunk of his income which he would ordinarily gain from his freelance work as an investigator. Since his work as a freelancer is dependent on his reputation, which is now tarnished due to the defamation, his personal business has also taken a hit.

I conservatively estimate that Mr. Menge has lost the opportunity of working with at least 8 - 10 attorneys over the course of this incident. His usual flat fee for a 10-hour investigation project is $1,000. He charges extra for every project exceeding that time frame. Considering the same, I estimate that he has lost at least if not more than 6 - 8 projects coming from each attorney yearly.

That will mean losing projects worth: [8 x (7x$1,000) – 10 x (7x$1,000)] = $56,000 – $70,000 yearly.

The cause of action arose in March of 2023 which translates into lost opportunities of almost $84,000 - $105,000 to this date.

Over the next three years, I estimate that economic damages in lost income will amount to: 3 x ($56,000 – $70,000) = $168,000 - $210,000.

Therefore, in my opinion, the economic damages in the form of Mr. Menge's lost projects, opportunities to grow his practice up to this time and the loss he would continue to suffer (in the next three years conservatively) are in excess of atleast $283,500.

**Rehabilitative Damages**

The unique nature of this case necessitates an analysis to assess restoration damages for Brian Menge. Dedicated efforts in the form of a campaign are required to counteract the negative narrative against Mr. Menge. (Please refer to Appendix C: Sample Campaign Websites & Profiles) Rehabilitative damages are needed to restore trust in Mr. Menge's professional integrity by creating a definitively positive reputation for those who were offered a negative perception from the false statements.

Further, recovering trust and re-establishing the professional relationships that were built over years of effort will be a long and arduous task. This will result in the expenditure of significant resources and time. Rehabilitation is necessary to mitigate the harmful impact on Mr. Menge's prospects.

Our goal is to rehabilitate Mr. Menge's negative reputation and rebuild his standing within the law enforcement and legal communities. We seek to reestablish his credibility and create a favorable presence that will counteract the defamatory statements made against him. An overview of what we will undertake is given below:

1. An effective campaign requires ongoing analysis and testing. Close attention is given to a comprehensive, yet fluid list of all search results that populate for a particular keyword. We will first focus on an initial group of important keywords, with the remaining keywords gaining priority as results are achieved.

2. Our process is first applied to each keyword within the Google search engine. As the campaign yields results, a similar framework is implemented for the keywords on four other major search engines: Bing, Yahoo, Duckduckgo, and Searchencrypt.

3. We map separate mandates for image and news section results. We usually begin the image optimization process after we see some measurable progress on the standard search results.

4. Throughout the campaign we will create backlinks that strengthen the digital assets. The Google algorithm places heavy weight on the backlinks metric when ranking specific pages. A web page with a higher number of backlinks features more prominently on the search results relative to similar websites without the comparable interlinking strength.

5. A hallmark of our client experience is transparency. We provide monthly progress reports highlighting work performed and results starting at the end of the second month. While some of our strategies are proprietary, we often include backlinks, profiles, articles, and other tangible updates.

These actions ensure that our rehabilitation process is successful and Mr. Menge has a favorable presence online.

The fact that the defamatory video in question is still available on Facebook for the public at large or any internet user for that matter, is concerning. Additionally, the court documents available to the general public at a single click, adds another layer of complexity to the rehabilitation process and thus, necessitates investing in a modest rehabilitation campaign for Mr. Menge.

For public relations and rehabilitation we recommend $10,000/month - $20,000/month x 12 months - 18 months. Conservatively our recommendation, considering the range lower limit of the rehabilitation damages campaign, is $15,000 x 12 months = $180,000.

**Reputational Damages**

Reputational damages form a part of presumed damages. It is certain to assume that a person has suffered reputational damage and losses as a result of defamation since it is meant to attack the reputation. The risks and ramifications of reputational damages are intense and there is no set

standard to determine the actual value associated with it. The courts rely on multiple factors when awarding damages to one's reputation. It is impossible to reverse the past damage and completely rehabilitate Mr. Menge's negative reputation. The fact that there was intentional (malicious) harm to Mr. Menge's reputation necessitates strong consideration for a reputational damage award.

As detailed above, a modest rehabilitation campaign can only partially restore Mr. Menge's good name and counteract some of the negative narrative against him. Reputations are an individual's most valuable asset. They are hard to build. But as this case demonstrates, they can be compromised in a moment.

Reputations hold immense value because they are built on perceptions, beliefs, and opinions that others hold about an individual. These perceptions can shape how people view and interact with someone, influencing their trust, willingness to work with them, and professional prospects. While it's difficult to quantify reputations in concrete terms, their impact is undeniable.

When false accusations or negative information are spread about an individual, it can have far-reaching consequences, as this case demonstrates. Professional relationships are built on mutual understanding and respect. Quantifying trust and relationships is challenging because they involve complex emotions, subjective perceptions, and individual experiences. Naturally, measuring the exact harm of losing one's professional reputation is incalculable.

I have studied defamation and, again, been retained in multiple defamation cases to assess damages. The reason the category of "defamation per se" exists is precisely because calculating damages is subjective. That is why damages are presumed.

However, in my experience combining a number of factors can provide a solid structure for assessing damages based on the number of people the defamation reached as follows:

- **Ring 1 (Immediate contacts including colleagues, friends, family and those within the community)** – These are people who are intimately aware of and/or directly working with Mr. Menge, including colleagues and clients. The false statements affect these relationships, with Mr. Menge having to clarify and prove his stand. The accusations cause them to question his integrity, ability to deliver, and overall professionalism.

- **Ring 2 (Prospective clients, possible referrals, and contractors)** – This ring is the circle that is often worst affected in terms of future growth of Mr. Menge's professional practice. This is because these are groups and/or people who know Mr. Menge distantly and/or who might have been referred by existing clients and attorneys. Given the negative narrative, their image of Mr. Menge is tainted with distrust and questionability, and they may decide not to work or associate with him anymore.
- **Ring 3 (Strangers' scrutiny)** – This is among the most nebulous groups, as the false narrative and general negativity around Mr. Menge in his professional community may reach a large number of people through word of mouth. This may frame a negative perspective in the minds of people who hear about Mr. Menge for the first time, causing intangible and invaluable damages.

The category of *"defamation per se"* exists precisely because calculating exact damages is impossible in cases such as these, especially those involving Ring 3. It is imperative to note that the video still remains available on Highland Park's Facebook group for anyone to look at even without logging in. The engagement on the said video in question may not be much but there are certainly more people who may be viewing it.

Adding the three reputational rings together, I calculate and estimate that damages for this category total no less than $550,000 - $750,000.

**Emotional Distress Damages**

Emotional distress damages don't fall under a specific definition but include experiences with psychological issues after the event. They're helping in compensating individuals who's daily life has been impacted as the forms of emotional distress are long and varied. Some of these manifestations include sleep loss, anxiety, depression, humiliation, etc.

Enduring false accusations of criminal behavior and defamation can have profound effects on an individual's mental and emotional well-being. The distress caused by the defamation, including anxiety, embarrassment, and loss of self-esteem, warrants compensation for the psychological harm suffered by Mr. Menge.

Commenting on his experience dealing with the emotional distress, he noted that he's *"lost sleep over it,"* and he's been *"going to see a therapist every couple of weeks."* Furthermore, he noted that his children and his ex-wife have also been openly asked about the defamatory allegations in public. His former colleagues and many of his friends have been approached on allegations about him stealing cars from the police impound and him stealing from the drug forfeiture fund. These events have added to Mr. Menge's humiliation and emotional distress, making his daily life difficult.

Since the allegations, Mr. Menge has been seeing Dr. Zambo, who's been helping him navigate his emotional distress since. Commenting on the same, Dr. Zambo noted:

> *"from an emotional perspective to have someone say "I really can't trust you anymore" has been a significant blow to him and that's something that he's going to continue navigating through his therapy."*

Furthermore, he commented on Mr. Menge's ability to conduct himself professionally, Dr. Zambo said:

> *"It's exhausting him emotionally and physically. He appeared physically exhausted because he was consumed with thoughts about how the allegations will now affect his future not just income but uh personally and professionally. The anxiety has been quite prevalent in his daily functioning and as I mentioned just a moment ago to the point that it has disrupted his sleep."*

The aforementioned exemplifies the emotional distress Mr. Menge has suffered as a result of the allegations. Mr. Brian Menge has suffered significant emotional distress as a result of the defamatory statements. To cope with the stress and anxiety caused by these allegations, Mr. Menge has been attending therapy sessions. Each session costs $150, and he has already attended three sessions, with one more upcoming. The total cost incurred for these therapy sessions thus far is $600. This financial burden further underscores the emotional and psychological impact of the defamation on Mr. Menge, highlighting the necessity of compensatory damages to address the emotional distress he has endured. In similar cases I have been retained, and in examining the consequences, a fair and reasonable award for Mr. Menge's emotional damages would range from $250,000 - $300,000.